IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

316 CHARLES, LLC        :

       :

  v.        :   Civil Action No. DKC 21-0787

       :

LIBERTY MUTUAL INSURANCE
COMPANY, et al.        :

       :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this insurance case are two motions: (1) a motion to dismiss filed by Defendant Liberty Mutual Insurance Company ("Liberty Mutual"), and (2) a motion for partial summary judgment filed by Plaintiff 316 Charles, LLC ("Cazbar"). (ECF Nos. 7; 11). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted and the motion for partial summary judgment will be denied.

## I. Factual Background

### A. The Rainstorm

On August 12, 2020, a rainstorm caused substantial damage to Cazbar, a Turkish restaurant located at 316 North Charles Street, Baltimore. (ECF No. 4, at 4 ¶ 12 (Complaint); *id.*, at 431, 434, 436 (Engineer's Report)). The restaurant, which Plaintiff began operating in 2006, has been closed since. (*Id.*, at 4 ¶ 12, 8,

¶ 33).  The only evidence presented of the damage is a report by an insurance-company-hired engineer who inspected the property on August 26, two weeks after the storm.  (*See generally id.*, at 431-52).[1]  Even so, the parties dispute what damage occurred and how.

Cazbar is in an "east-facing, two-story, row-style" brick building.  (ECF No. 4, at 431).  The building has a "low-sloped roof surfaced with a coated built-up roofing membrane."  (*Id.*).  There are two skylights, one on the east side of the roof and another on the west side.  (*Id.*).  The roof slopes down toward the northeast corner where "a single through-wall scupper," or drain, 3.5 inches wide, connects to a downspout which connects with another downspout from the adjacent building before running beneath the sidewalk.  (*Id.*, at 433).  There are "[n]o other drains or scuppers," or a "secondary opening through the parapet wall above the scupper."  (*Id.*).

Precise measurements of the storm conditions at the restaurant are not available.  (ECF No. 4, at 434).  The National Oceanic and Atmospheric Administration ("NOAA") weather station at Baltimore-Washington International Airport ("BWI"), approximately 8.5 miles away, recorded 3.51 inches of rain and wind gusts up to forty-seven miles-per-hour.  (*Id.*).  This was the "ninth-highest daily precipitation recorded at BWI since 2006[.]"  (*Id.*).  Had

---

[1]  The court does not rely on the photos included in the engineer's report because their quality as submitted is too poor.

the same amount of rain fallen at a closer NOAA station, which had no data for August 12, it would have been the fifth highest amount recorded since 2006. (*Id.*). Photos from the day of the storm show water ponded "several inches deep at the east end of the roof," past the edge of the east skylight. (*Id.*, at 433). They also show that the scupper inlet was "not apparently obstructed by debris." (*Id.*).

When inspected by the engineer, the restaurant's "roof surface coating was cracked and stained, and the roofing membrane was wrinkled near the northeast corner[.]" (ECF No. 4, at 433). In addition, the flashing was separated by half an inch from the east wall and the "cricket" below had a water line stain. (*Id.*). Sealant had been applied at the base of the east skylight on three sides. (*Id.*). It was pliable when inspected. (*Id.*). The wood framing and sheathing enclosing the skylight were stained. (*Id.*). Although there were no obstructions in the scupper, leaves and sediment were found nearby. (*Id.*). There were "[n]o tears or punctures in the roofing membrane consistent with [an] impact from fallen or wind-borne debris[.]" (*Id.*).

Inside, the finish was removed from the ceiling near the east skylight. (ECF No. 4, at 432, 435). "[W]idespread" water stains were found in the same area. (*Id.*). Other water stains were also found near the east wall and several feet inward. (*Id.*, at 432). The "[r]oof rafters were absent of fracturing or excessive

deflection" and "[t]he east ends of the rafters within the brick wall beam pockets were absent of any visible downward displacement." (*Id.*).  No plumbing leaks were identified.  (*Id.*).

Based on these findings, the engineer concluded that rainfall infiltrated the roof and damaged the building because of "improper drainage of the roof surface in conjunction with improper maintenance of the roof."  (ECF No. 4, at 436).  The water did not penetrate the building because of wind-created openings or a plumbing failure.  (*Id.*, at 434-35).  Nor was there evidence of the roof collapsing from the weight of the pooled water, as evidenced by the lack of displacement or excessive deflection in the rafters.  (*Id.*, at 435).  Instead, the ponded water likely infiltrated the area around the east skylight and the cracks and wrinkles in the roof surface, as evidenced by the pattern of interior and exterior stains.  (*Id.*).  Falling rain likely also exploited the gap between the flashing and the east parapet.  (*Id.*).  That gap was likely caused by "poor attachment" of the roofing materials to the brick parapet.  (*Id.*).

The ponding was most likely caused by an obstruction in the downspout.  (ECF No. 4, at 435).  The scupper inlet appeared unobstructed on the day of the storm and was likely large enough to handle the volume of rainwater given the lack of similar damage during prior, larger storms.  (*Id.*).  The failure to include an overflow scupper was, however, poor design or construction.  (*Id.*).

**B.    The Insurance Claim**

Cazbar filed an insurance claim for building and business property damage and possibly for lost business income and extra expense insurance, although the claim is not attached. (ECF No. 4, at 5 ¶ 16, 7 ¶¶ 25-27; *id.*, at 64, 68 (Policy)). All agree that Defendant Ohio Security Insurance Company ("Ohio Security") underwrote the insurance policy. (*See, e.g.*, ECF No. 8, ¶¶ 7-8). The restaurant alleges it was also insured by Liberty Mutual. (*See* ECF No. 4, at 2 ¶ 7).

Three weeks after the inspection, Cazbar's insurance claim was denied. (ECF No. 4, at 407). The denial letter reiterated the engineer's conclusion that the infiltration was caused by "improper drainage of the roof surface in conjunction with improper maintenance of the roof." (*Id.*, at 408). It then concluded primarily that coverage for damage from "faulty, inadequate or defective design, specifications, workmanship, repair, [m]aterials used in repair[,] and maintenance" is excluded, as is coverage for damage to the inside of a building or its contents caused by rain, unless the rain entered through damage from a covered cause. (*Id.*, at 408-09). The letter also pointed to exclusions for wear and tear, "deterioration, hidden or latent defect[,] or any quality in property that causes it to damage or destroy itself," and cracking. (*Id.*, at 408).

Cazbar's subsequent request for reconsideration was denied. A second letter reiterated the original denial while also rejecting Cazbar's suggestion that the building had partially collapsed. (ECF No. 4, at 454-58).  It also went on to conclude that even if a collapse occurred, "[t]he policy excludes damage from collapse, [and] the additional coverage for collapse is not applicable to [Cazbar's] loss." (*Id.*).

## II.  Procedural Background

Cazbar filed this suit in the Circuit Court for Baltimore County in February 2021, asserting claims for breach of contract and lack of good faith.  (ECF No. 4, at 19-20).  The complaint includes four attachments: (A) the insurance policy, (B) the initial denial letter, (C) Cazbar's letter in response, and (D) the second denial letter.  (*Id.*, at 24, 406, 411, 453).  Attached to the response letter are: (1) a receipt for alleged 2019 roof maintenance, and (2) the engineer's report.  (*Id.*, at 428, 430).

Liberty Mutual and Ohio Security timely removed to this court. (ECF Nos. 1, ¶ 2; 4-2, at 1).  Liberty Mutual moved to have the claims against it dismissed and Ohio Security answered.  (ECF Nos. 7; 8).  Cazbar opposed the motion to dismiss and Liberty Mutual replied.  (ECF Nos. 10; 12).  Cazbar also moved for partial summary judgment.  (ECF No. 11).  Defendants opposed and Cazbar replied.  (ECF Nos. 13; 14; 15).  Discovery has not begun.  No evidence beyond the attachments to the complaint has been produced.

### III. Motion to Dismiss

Liberty Mutual moves to dismiss the claims against it, arguing that it does not have a contractual duty to provide coverage to Cazbar and, as a result, the restaurant does not have standing or an adequate complaint.  (ECF No. 7-1, at 1, 4, 6).  It is not clear that Liberty Mutual should be able to challenge standing on the basis it never formed an insurance contract with Cazbar because the existence of the contract is a merits question.  *See Domain Protection, LLC v. Sea Wasp, LLC*, No. 20-40411, 2022 WL 123408, at *4 (5th Cir. Jan. 13, 2022) ("Whether a party has a contractual right to bring [] suit is not a question of Article III standing.  [It] is instead an issue of contract interpretation that goes to the merits of a claim." (cleaned up)).  It is not necessary to resolve this question because the standard of review will be the same for both asserted bases of Liberty Mutual's challenge, as discussed below.

### A.    Standard of Review

Questions of subject matter jurisdiction must be decided first because they concern the court's authority to hear the case.  *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).  The plaintiff bears the burden of proving that subject matter jurisdiction exists.  *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).  A defendant may challenge subject matter jurisdiction in one of two ways: facially or factually.

*Kerns v. United States*, 585 F.3d 187, 192 (4ᵗʰ Cir. 2009) (citation omitted).  To determine which type of challenge is made, some courts assess whether the defendant attached evidence, such as an affidavit, to its motion.  *Hosn v. Iraq Ministry of Transp.*, 811 F.App'x 949, 951 (6ᵗʰ Cir. 2020); *Akers v. Shaw Env., Inc.*, No. 09-cv-0915, 2010 WL 145137, at *2 (W.D.La. Jan. 7, 2010).  Others do not and courts have conflicting views when a defendant challenges the existence of a contract or an individual's status as a policy beneficiary.  Compare *Altera Excess & Surplus Ins. Co. v. Excel Title Agency, LLC*, No. 13-cv-11672, 2014 WL 12656720, at *1 (E.D.Mich. Jan. 21, 2014) (facial), *with Higdon v. Lincoln Nat'l Ins. Co.*, No. 13-cv-2152-ELH, 2014 WL 6951290, at *5 (D.Md. Dec. 8, 2014) (factual).  At least one court used its discretion to categorize a challenge to the existence of a contract as factual because it went to the merits.  *Hopkins v. Viva Beverages, LLC*, No. 13-cv-1017, 2014 WL 1612365, at *3 (N.D.Tex. Apr. 21, 2014).

Liberty Mutual's challenge will be treated as facial.  It does not offer any evidence of its own and it makes the same merits challenge under Rule 12(b)(6).  When defendants challenge subject matter jurisdiction facially, the plaintiff "is afforded the same procedural protection" as under Rule 12(b)(6).  *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4ᵗʰ Cir. 2017) (quotation omitted).  "[T]he motion must be denied if the complaint alleges sufficient

facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192.

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[] of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

Attached documents "integral to the complaint and authentic" may be considered on a motion to dismiss. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The insurance contract, letters of denial, Cazbar's request for reconsideration, and the engineer's report are considered here. They are essential

to the complaint and their authenticity is undisputed. Defendants'
corporate disclosures may also be reviewed as matters of public
record. *See Philips*, 572 F.3d at 180; *Total Benefits Planning
Agency, Inc. v. Anthem Blue Cross Blue Shield*, 552 F.3d 430, 435
(6th Cir. 2008); *Mills v. Anne Arundel Cnty.*, No. 15-cv-0495-RDB,
2016 WL 3057973, at *7 (D.Md. May 31, 2016).

 B.  **Existence of Contract**

 Liberty Mutual argues that it is not obligated to provide
coverage under the insurance policy, only Ohio Security is.  All
parties agree that Maryland law governs.  An insurance policy is
a contract and the same rules of construction apply. *Connors v.
GEICO*, 442 Md. 466, 480 (2015); *TIG Ins. Co. v. Monongahela Power
Co.*, 209 Md. App. 146, 161 (2012), *aff'd*, 437 Md. 372 (2014).
Typically, "a person cannot be held liable under a contract to
which he was not a party." *Snider Bros., Inc. v. Heft*, 271 Md.
409, 414 (1974).  The "most important factor" in determining
whether parties have manifested an intent to be bound to a contract
is the contract's language. *Cochran v. Norkunas*, 398 Md. 1, 15
(2007).  The meaning of contract language is a question of law
determined objectively. *Id.*, at 16 & n.7.  If the language is
unambiguous, courts must "give effect to its plain meaning and []
not contemplate what the parties may have subjectively intended by
certain terms at the time of formation." *Id.*, at 16 & n.8.

The insurance policy creates a duty to provide Cazbar with coverage.  The question is who the contract imposes that duty on.  The answer is Ohio Security because it is the sole issuer named in the policy.  *See Kurland v. ACE Am. Ins. Co.*, No. 15-cv-2668-JKB, 2017 WL 354254, at *2 (D.Md. Jan. 23, 2017); *see also Steinhauer v. Liberty Mut. Ins. Co.*, No. 20-35837, 2021 WL 5632475, at *1 (9th Cir. Dec. 1, 2021) (unpublished).  The policy states on its many declarations pages that "Coverage Is Provided in: Ohio Security Insurance Company." (*E.g.*, ECF No. 4, at 62).  A "Notice of Change in Policy Coverage" page also identifies the "Issuing Company" as "Ohio Security Insurance Company." (*E.g.*, *id.*, at 139).

In Cazbar's defense, there are many references to "Liberty Mutual" or "Liberty Mutual Insurance" throughout the policy.  In the middle of the "Notice of Change" page, the policyholder is thanked for "choosing Liberty Mutual Insurance." (*E.g.*, ECF No. 4, at 139).  At the bottom, it states that all rights are reserved by "Liberty Mutual Insurance Company." (*E.g.*, *id.*).  Other pages assert a copyright by "Liberty Mutual Insurance" (while noting the contract includes, with permission, material copyrighted by "Insurance Services Office, Inc."). (*E.g.*, *id.*, at 138).  The declarations pages display a "Liberty Mutual Insurance" logo in the top left corner. (*E.g.*, *id.*, at 62).  In addition, a page instructing the policyholder how to report a claim states that, "Liberty Mutual Insurance claims professionals" and "Liberty

11

Mutual customer service representative[s]" are available to report and resolve claims. (*E.g.*, *id.*, at 121). Below, it encourages the policyholder to consult "the Policyholders Toolkit" at "www.libertymutualgroup.com/toolkit" for state-specific information. (*Id.*).

But these references do not undermine the unambiguous language identifying Ohio Security as the issuer. *See Kurland*, 2017 WL 354254, at *2; *see also Fancy That! Bistro & Catering, LLC v. Sentinel Ins. Co.*, No. 20-cv-2382-BHH, 2021 WL 4804974, at *5 (D.S.C. Oct. 14, 2021). Nor would the canon to construe the language of an insurance contract against the insurer, which only applies to ambiguous language. *Connors*, 442 Md. at 482-83. Although Cazbar might justifiably have been confused by these many references, *see Steinhauer v. Liberty Mut. Ins. Co.*, No. 18-cv-1416, 2020 WL 5743936, at *2 (D.Or. Sept. 25, 2020), its decision to name Ohio Security as a defendant demonstrates the core message got through. Defendants' corporate disclosures also show that citations to "Liberty Mutual" may not refer to Liberty Mutual Insurance Company and do not necessarily exclude Ohio Security. Both disclosures make clear that Liberty Mutual Insurance Company and Ohio Security Insurance Company are part of a family of companies controlled by Liberty Mutual Holding Company, many of which include "Liberty Mutual" in their name. (ECF Nos. 2, at 1-2; 3, at 1-2).

Cazbar asserts in the alternative that "Liberty Mutual made itself a party to the Policy contract" by performing contractual obligations. (ECF No. 10-1, at 9). Courts do not look to extrinsic evidence of party conduct where the contract language is unambiguous. *Cochran*, 398 Md. at 16 & n.8. A company that was not party to the underlying insurance contract can, however, become liable for breach if it "subsequently adopted or assumed" the policy's obligations. *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, No. 12-cv-0401-ELH, 912 F.Supp.2d 321, 333-34 (D.Md. 2012) (citing *Snider Bros.*, 271 Md. at 414). But that adoption must be express, it cannot be implied. *See id.* As in *Whiting-Turner*, Cazbar has not alleged that Liberty Mutual expressly adopted or assumed Ohio Security's contract obligations. *Id.* As noted above, the complaint alleges instead that Liberty Mutual was a party to the contract from the beginning. (ECF No. 4, at 5 ¶ 17).

The single case Cazbar cites in support of its position is unpersuasive. The Pennsylvania Court of Common Pleas opinion held that a parent insurer, which wholly owned the insurer identified in the policy, was a proper party because it found that the parent had sent the denial letter and, as a result, it was proper to pierce the corporate veil at summary judgment. *Ungarean, DMD v. CNA*, No. GD-20-006544, 2021 WL 1164836, at *1 & n.1 (Pa. Ct. of Common Pleas Mar. 25, 2021). Cazbar does not argue that piercing

the veil would be appropriate under Maryland law.  In addition, this is a motion to dismiss.  Even if it were one for summary judgment, Cazbar may not have shown that Liberty Mutual Insurance Company adjusted its claims because the evidence it cites, (ECF No. 4 at 407, 431, 454), only identifies "Liberty Mutual," which could reference many entities, including Ohio Security.

Cazbar's final attempt to salvage its claims against Liberty Mutual also fails.  It argues that the insurer took on the duty to act in good faith when it allegedly adjudicated Cazbar's claims. (ECF No. 10-1, at 1-2).  Cazbar misunderstands Maryland's good faith statute, which applies to first-party property and casualty coverage.  Md. Code Ann., Cts. & Jud. Proc. § 3-1701(b).  It provides consequential damages of expenses, litigation costs, and interest against an insurer that failed to act in good faith. Liberty Mutual was not a party to Cazbar's insurance contract and thus not its insurer.  Liberty Mutual's motion to dismiss will be granted and it will be dismissed from the case.

**IV.  Motion for Partial Summary Judgment**

Cazbar moves for summary judgment on all but damages, arguing that there is no dispute of material fact relevant to its breach of contract and lack of good faith claims and that it is entitled to judgment as a matter of law on the merits of both.  (ECF No. 11, at 1-2).

14

**A.    Standard of Review**

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgement should be granted only when it is perfectly clear that no issue of material fact exists." *Raynor v. Pugh*, 817 F.3d 123, 129 n.2 (4th Cir. 2016) (quotation omitted).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Liberty Lobby*, 477 U.S. at 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted), but "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a

sufficient showing on an essential element that he bore the burden to prove. *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

   **B.   Breach of Contract**

   As noted above, contract law applies to insurance policies. *Connors*, 442 Md. at 480. To prevail in an action for breach of an insurance policy, a plaintiff must prove that the defendant had a contractual duty to provide coverage for the plaintiff's damages and that the defendant breached that duty. *See Taylor v. NationsBank N.A.*, 365 Md. 166, 175 (2001). "[T]he insured party bears the burden of proving that coverage exists. If coverage is established, the burden shifts to the insurer to establish that a certain claimed loss falls within a policy exclusion." *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. 18-cv-2918-ELH, 2020 WL 1063060, at *8 (D.Md. Mar. 5, 2020) (cleaned up) (citing *Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 490 (2013)). "[I]f the insurer successfully establishes that the loss is excluded, the burden shifts to the insured to demonstrate that the damage falls within an exception to the exclusion." *Bao v. Liberty Mut. Ins. Co.*, 535 F.Supp.2d 532, 535 (D.Md. 2008) (citing

*Simkins Indus., Inc. v. Lexington Ins. Co.*, 42 Md.App. 396, 401 (1979)).

Insurance policies are to be construed pursuant to "ordinary principles of contract interpretation." *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655, 796 A.2d 758 (2002) (internal quotations marks omitted). The words used in a policy should be given "their usual, ordinary, and accepted meaning"—i.e., the "meaning a reasonably prudent layperson would attach to the term." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779 (1993). Because "exclusions are designed to limit or avoid liability," however, "they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage." *Bethany Boardwalk Grp.*, 2020 WL 1063060, at *8 (quoting *Megonnell*, 368 Md. at 656). As noted above, the meaning of unambiguous provisions of an insurance policy are determined by the court as a matter of law. *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533 (2000).

The dispute in this case is about whether exclusions apply to Cazbar's claim. All agree that the damage to the building and property would otherwise be covered by the broad policy for "direct physical loss of or damage to" a covered building or a business's personal property. (ECF No. 4, at 63, 232, 254). (Cazbar's policy also covers lost business income and extra expenses. Neither are

addressed in this opinion because no party discusses whether any of Cazbar's losses from closing its restaurant are covered.)

Cazbar has not met its burden to show that it is entitled to judgment on undisputed facts.  The only evidence of the damage at 316 North Charles Street is the engineer's report.  Cazbar argues that the report is flawed and that it is entitled to judgment because Ohio Security should not have relied on it.  (*See, e.g.*, ECF No. 10-1, at 3).  That position is meritless and relies on a standard of certainty ungrounded in law or logic.  It also misrepresents the factual findings within the report.  This conclusion leaves Cazbar with nothing but the report, which contains sufficient evidence to conclude that coverage is precluded, at least in part, by the exclusions for faulty design or construction and inadequate maintenance, as well as a limit on coverage for interior rainwater damage.

### 1.  Faulty Design or Construction and Inadequate Maintenance Exclusions

The policy excludes losses or damages "caused by or resulting from":

> Faulty, inadequate or defective:
>
> . . .
>
> (2)  Design,   specifications,   workmanship, repair,   construction,   renovation, remodeling, grading, compaction;
>
> (3)  Materials used in repair, construction, renovation, or remodeling; or

> (4)   Maintenance;
>
> of part or all of any property on or off the
> described premises.

(ECF No. 4, at 258 (Section B.3.c)).   The parties dispute whether
subclause (2), "faulty design or construction," applies to damage
caused by the rainwater ponding and whether subclause (4),
"inadequate maintenance," applies to damage caused by the water
infiltrating the roof.

### a)   Rainwater Ponding

Whatever its precise definition, the engineer's report can
support finding that "faulty, inadequate or defective design or
construction" was a cause of damage.   It finds that rain ponded at
least several inches deep at the east end of the roof and concludes
that rainfall infiltrated and damaged the building in part because
of "improper drainage of the roof surface[.]"   (ECF No. 4, at 434,
436).   When discussing possible causes of the ponding, the report
explicitly suggests that the failure to include an overflow scupper
"is indicative of a poorly designed and/or constructed drainage
scheme for the roof."   (*Id.*, at 435).   There can be no doubt that
"poor design or construction" is synonymous with "faulty,
inadequate or defective design or construction."   Cazbar almost
concedes as much.   (ECF No. 10-1, at 23).   Although the language
is tentative, a reasonable juror could rely on it to find that
this exclusion applies.

**b)   Rainwater Infiltration**

The engineer's report can also support finding "faulty, inadequate or defective maintenance," whatever its precise definition, was a cause of damage.  It explicitly concludes that rainfall infiltrated and damaged the building in part because of "improper maintenance of the roof."  (ECF No. 4, at 436).  The engineer could scarcely have been clearer that maintenance failures contributed to the damage had he used the exact contract language.  This conclusion was also supported by the engineer's observations that the roof had various deficiencies including cracks, wrinkling, and flashing that had dislodged from the building walls.

To be fair to Cazbar, the report is not clear about how the area around the east skylight was infiltrated.  Of course, this lack of clarity alone does not entitle Cazbar to judgment, at least not when coupled with the report's clear conclusion and plain description of how water likely entered elsewhere.  In addition, drawing all inferences in favor of Ohio Security, a reasonable juror could conclude that the rainwater infiltrated the cracks and wrinkles and ran along the rafters before falling to the ceiling at the skylight.  The juror might also conclude that the rainwater penetrated the fourth, unsealed, side of the skylight and that the failure to seal that side amounted to inadequate maintenance.  Cazbar cannot defeat the exclusion merely by arguing that rain

penetrating the skylight was a direct physical loss.  (ECF No. 10-1, at 22).[2,3,4]

## 2.   Interior Rainwater Damage Limitation

The policy "will not pay" for the "loss of or damage to":

> The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not [or "any loss that is a consequence of" the same], unless:
>
> (1)  The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters[.]

(ECF No. 4, at 259-60 (Section C.1.c)).

---

[2] The court declines to reach several other exclusions discussed in the parties' papers—wear and tear, deterioration, and cracking—because they are simply alternative theories for excluding the "improper maintenance" identified by the engineer.

[3] Cazbar argues that Ohio Security's reliance on the faulty design or construction and inadequate maintenance exclusions is improper post-claim underwriting.  (ECF No. 10-1, at 19).  As Ohio Security notes, Cazbar complains about ordinary claim investigation and denial, not underwriting that repudiates coverage entirely (or alters the price at which the same coverage is provided).  *Cf.* Md. Code. Ann., Ins. § 8-201(d).

[4] Cazbar also argues that even if the faulty design or construction and inadequate maintenance exclusions apply, an "ensuing loss" clause, (ECF No. 4, at 258), allows it to claim coverage for all damages except the cost of upgrading its roof's drainage system and, presumably, repairing the cracks, wrinkles, and gaps in the roof surface.  (ECF No. 10-1, at 18-19).  The court need not reach this question because there is sufficient evidence to conclude that the interior rainwater damage limitation, which does not have an ensuing loss clause, applies, as discussed below.

In other words, interior rainwater damage to a building and to personal property will only be covered if the rainwater entered the building through "damage by a Covered Cause of Loss to its roof or walls[.]" (ECF No. 4, at 260). Exclusions are not covered causes. (*See id.*, at 254). The engineer's report can support finding that the rainwater entered the restaurant through damage resulting from an excluded cause, inadequate maintenance.

Cazbar's argument that the interior rainwater limitation does not apply because the ponded rainwater on the roof was "surface water" and not "rain" is self-defeating, as Ohio Security notes. Loss or damage caused by "Water," including "surface water," is excluded under the policy. (ECF No. 4, at 255 (Section B.1.g(1))). This exclusion is subject to an anti-concurrent causation clause, whereby any "loss or damage [it causes] is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (*Id.*, at 254). As the Fourth Circuit recently made clear, if an insurer can show that a cause subject to such a clause contributed to the claimed loss or damage, the exclusion applies and no coverage is available, regardless whether other causes contributed. *David S. Brown Enters., LTD v. Affiliated FM Ins. Co.*, No. 21-1051, 2022 WL 61424, at *3 (4th Cir. Jan. 6, 2022) (unpublished) (collecting cases). Were the court to conclude that pooled rainwater is "surface water," as at least one court in this District has done, *Bao*, 535 F.Supp.2d at 535-36, it

might be fatal to Cazbar's breach of contract claim.  The court declines to reach this question given that Ohio Security did not assert it as a ground for denial.[5]

### 3.    Collapse Exclusion

Cazbar argues that rainwater infiltrated the building because the weight of the ponded rain caused a collapse, damage from which was covered as an exception to the policy's collapse exclusion and under its additional collapse coverage.  (ECF No. 10-1, at 22-24). Cazbar advances this argument to defeat the interior rainwater limitation but it is treated separately because it requires substantial discussion.

The policy excludes loss or damage "caused by or resulting from":

> Collapse, including any of the following conditions of property or any part of the property:
>
> (1)  An abrupt falling down or caving in;
>
> (2)  Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
>
> (3)  Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

---

[5] Although not discussed by the parties, the water exclusion extends to "water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment," except as provided under a coverage extension. (ECF No. 4, at 279-80, 294; *see also id.*, at 254-55).  It is unclear whether this exclusion and the related coverage extension are relevant to the "improper drainage" discussed above.

(ECF No. 4, at 256-57 (Section B.2.k)).

The collapse exclusion does not apply if the collapse was "caused by" the "[w]eight of rain that collects on a roof[.]" (*Id.*, at 257-58).  The exclusion also does not apply "[t]o the extent that coverage is provided under Additional Coverage, Collapse[.]" (*Id.*, at 257).  Additional collapse coverage "applies only to an abrupt collapse," which means "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose."  (*Id.*, at 261 (Section D)).  It does not mean "[a] building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."  (*Id.*).

Cazbar has not shown that it is entitled to judgment because it misrepresents the engineer's report, and it overlooks the conditions required for a collapse.  Both the "weight of water" exception and the additional collapse coverage could be satisfied if Cazbar showed an "abrupt falling down or caving in."  There is no other way to satisfy the additional collapse coverage requirements.  The "weight of water" exception could separately be satisfied if Cazbar could show loss of structural integrity, possibly with related "sagging" or "bending."

Nothing in the engineer's report supports finding that the building at 316 North Charles Street abruptly fell down or caved

in.  At most, Cazbar seems to suggest a loss of structural integrity through sagging or bending by arguing that the engineer necessarily found that some deflection occurred when he concluded that "excessive deflection" did not occur.  (ECF No. 10-1, at 23). That misrepresents the report, which addressed the suggestion that the weight of water "pushed the roof structure down such that it was in a state of collapse" and concluded that there was "no evidence of fracturing or excessive deflection and no downward displacement of [the rafter's] east ends within the beam pockets[.]"  (ECF No. 4, at 435).  It went on, "the ponded rainwater would not have been able to pull down on the vertical surface of the parapet base flashing."  (*Id.*).  Even assuming Cazbar's interpretation were plausible, it would mean only that there is a dispute of material fact.

Cazbar is not entitled to judgment on its breach of contract claim.  Its motion for summary judgment on that claim will be denied.

### C.   Lack of Good Faith

As noted above, Maryland imposes a duty of good faith on first-party property and casualty insurers.  Md. Code Ann., Cts. & Jud. Proc. § 3-1701(b), (d)(2).  Holders of commercial policies who have filed a claim "with respect to which the applicable limit of liability exceeds $1,000,000" may sue their insurer for failure to act in good faith.  *Id.* § 3-1701(c), (d)(2).  "In essence, first

party coverage is a promise by the insurer to pay its own insured, rather than a promise to pay some third party." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 355 Md. 566, 583 (1999) (cleaned up). "'Good faith' means an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." *Id.* § 3-1701(a)(5); *see also Barry v. Nationwide Mut. Ins. Co.*, 298 F.Supp.3d 826, 829-30 (D.Md. 2018).

Cazbar's lack of good faith claim is premised entirely on the purported bad faith denial of its insurance claim and a failure meaningfully to respond to the objections in its request for reconsideration. (*See* ECF No. 10-1, at 24-25). Because there is sufficient evidence for a reasonable juror to conclude that Ohio Security properly denied Cazbar's claim, the lack of good faith claim necessarily fails.

Cazbar is not entitled to judgment on its lack of good faith claim. Its motion for summary judgment on that claim will also be denied.

### D.  Rule 56(d)

Liberty Mutual and Ohio Security each argue that summary judgment "is premature" because there has not been necessary discovery in this case and submit matching Rule 56(d) affidavits from their shared attorney in support. (ECF Nos. 13, at 1; 13-1; 14, at 6; 14-1). Rule 56(d) allows the court to deny a motion for

summary judgment or delay ruling on the motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).  The court need not reach Defendants' Rule 56(d) arguments because Cazbar fails to demonstrate that it is entitled to judgment, as discussed above.

**V.   Conclusion**

For the foregoing reasons, Liberty Mutual's motion to dismiss will be granted and Cazbar's motion for partial summary judgment will be denied.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
